UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)    Criminal No. 11-10022-DJC<br>v.    )<br>)<br>)<br>KEVIN JOHNSON    ) | |

## GOVERNMENT SENTENCING MEMORANDUM

Kevin Johnson deserves to be sentenced to every day of the maximum sentence that Congress provided for the crime that he was convicted, 10 years in prison. Not just because the nature and circumstances of the incident warrant it. Not just because Johnson's criminal record, fraught with firearm-related offenses,[1] supports it. Post-<u>Booker</u> sentencings frequently focus on one aspect of the crime or the person who committed them, like the nature of the crime that dictates a particular period of incarceration. Other times, it is the history of the defendant and his criminal record that stands out. The government seeks the maximum sentence available because each of these factors demonstrates the seriousness of the case and the need for the maximum statutory sentence available.[2]

---

[1] Indeed, Johnson was on supervised release on none other than a federal gun conviction at the time that he committed this offense.

[2] The government is limited in its recommendation by the statutory maximum sentence afforded by the crime of conviction –

Kevin Johnson committed a firearms offense at night in a beleaguered Boston neighborhood. Johnson fired his gun repeatedly at unknown targets on a busy street hitting the vehicle of, and nearly hitting numerous innocent bystanders in the path of the gunfire. When approached by the police investigating that crime, he fled and lied about it.

Probation has properly concluded that the defendant has 9 criminal history points and an advisory guideline range of 110-137 months. PSR at ¶48 (criminal history score), ¶¶99-100 (minimum guideline sentence is 110 months and statutory maximum sentence is 120 months). In view of all the circumstances, what the government is requesting is a sentence of 120 months and three years of supervised release.

1. **The evidence supporting the offense of conviction**

The court heard the testimony at the trial and is certainly in the best position to assess it's impact on the appropriate sentence. The government chooses only to point out one aspect of the trial testimony, the 911 call of James Hankin. The government does so to emphasize the danger to residents from Johnson's spraying a crowded street with bullets as well as to

---

felon in possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1), a term of incarceration of 10 years. If not so limited, the government would seek a sentence at least at the upper end of the applicable guidelines sentencing calculation, a sentence of 137 months. Citizens of the Boston neighborhood where Johnson committed this crime demand that the government's recommendation be nothing less.

substantiate the enhancement found by probation based upon Johnson's possession of a firearm in connection with another felony offense, discussed in paragraph 3 below.

Steven Hankin's call displayed the seriousness of the offense and Johnson's utter disregard for the lives of others. After describing the route of travel, physical description of Johnson, and that he was in the direction of the firing of the gun, he described the bullet hole in a vehicle stopped nearby. (See Exhibit 1, photographs of the damage caused by the bullet fired from Johnson's gun).  The following exchange with the Boston Police dispatcher then took place:

CALLER:         My name is Steven Hankins.

DISPATCHER:     Stephen, what's the phone number for you?

CALLER:         617-XXX-XXXX

DISPATCHER:     Was the guy by himself or was he with someone?

CALLER:         It appeared to be that he was by himself.  What happened -- let me tell you how I seen it.

DISPATCHER:     Okay.

CALLER:         Some guys came out of Creston, was like at the corner of Creston Street running.  Okay?

DISPATCHER:     Okay.

CALLER:         And as I rode past them, the guy appeared more on Blue Hill Avenue was shooting towards them and they kept, you know --

DISPATCHER:     Okay.

```
CALLER:        All right?

DISPATCHER:    All right, sir, thank you so much.
```

See attached Exhibit 2, trial Exhibit 16A, the transcript of 911 call of Steven Hankins, [with the telephone number edited out]).

Hankins observations display the stark reality of gunfire in a crowded city block – many other persons lives hung in the balance while bullets whizzed past them.

**2.  The offense of conviction**

A significant sentence in this case is warranted due to the offense for which Kevin Johnson stands committed: illegally carrying a firearm in the Blue Hill Avenue section of Dorchester. But this is no gun toting case.  The illegal carrying of a firearm charge itself simply does not tell the complete story of Johnson's gun conviction.  Johnson fired a gun no less than eight times at unknown persons on a crowded urban street.  One need only read the newspaper each day to recognize the seriousness of gun violence in the city of Boston and the need to deal with firearms cases accordingly.  See United States v. Politano, 522 F.3d 69 (1st Cir. 2008) (in affirming above-guideline sentence in firearm trafficking case, First Circuit noted sentencing judge's reference to the "epidemic of handgun violence in communities within this district" and concluded that the district court "has the authority to conclude that the impact of this particular

4

offense is more serious than that reflected by the Sentencing Commission.").

These are cases that truly do result in the mass incarceration of entire neighborhoods.  See "On Lucerne Street, a Wary Savoring of Newfound Peace" (Boston Globe February 15, 2009)("To say that living in the Lucerne Street section of Dorchester was once a battle for survival is no exaggeration according to the residents of this neighborhood of multifamily houses, small churches, and bodegas..... But a walk through the streets there no reveals a neighborhood reclaimed.  People have begun sitting on their porches again, mothers let their children play outside longer, and workers are less wary walking home at night").[3]  The government asks only that these victims be given the same consideration in sentencing here.[4]

Of course, the sentencing calculus in this case must also include the fact that this is Kevin Johnson's third firearm-related offense.  See PSR at ¶43 (2003 firearm-related, ammunition offense); ¶44 (prior federal firearm offense in 2006).

---

[3]    Lucerne Street is located in Mattapan, several miles away from Blue Hill Avenue.  The defendant is also not alleged to be a member of the Lucerne Street Doggz.  The government nevertheless believes that the effect of gun violence affects innocent residents of Boston throughout the city and especially in the neighborhoods of Roxbury, Dorchester, and Mattapan.

[4]    Other important sentencing considerations furthered by the ten-year sentence requested here is general deterrence and the critical role that federal prosecution plays in urban settings where young offenders often fear nothing else.

Having previously been convicted of illegally possessing a firearm on a prior occasion, the defendant still went out and did it again while on probation for the very same charge. He undoubtedly deserves a serious sentence. See United States v. Laury, 985 F.2d 1293 (5th Cir. 1993)(repeated convictions displayed tendency towards recidivism that warranted *upward departure* under U.S.S.G. 4A1.3); United States v. Brewster, 127 F.3d 22, 25-28 (1st Cir. 1997) (same). See generally United States v. Dillard, 214 E.3d 88 (2nd Cir. 2000) ("The prohibition of gun possession by previously convicted criminals seeks to protect society by reducing the risk of violence that may result from the possession of guns by persons inclined to crime. By possessing guns in violation of that law, previously convicted criminals increase the risk that they may engage in violent acts. The risk results from the nature of the offense.").

### 3. **The possession of a firearm in connection with another felony offense**

The Probation Department awarded a 4-level enhancement based upon the defendant's possession of the firearm during the commission of a felony offense under U.S.S.G. §2K2.1(b)(6)(B). See PSR at ¶28. This enhancement is proper based upon the evidence in this matter at trial. In particular, the 911 call of Steven Hankins made clear that Johnson fired his gun at his enemies as they ran for their lives. See Exhibit 2 ("And as I rode past them, the guy appeared more on Blue Hill Avenue was

*shooting towards them* and they kept, you know – ")(emphasis added). He missed (apparently) and instead struck an innocent passerby's car with gunfire. See Exhibit 1. This evidence supports the finding of the enhancement as felony assault under state (and federal) law and meets the requirements of U.S.S.G. §2K2.1(b)(6)(B). See United States v. Leahy, 668 F.3d 18, 23 (1st Cir. 2012)(affirming the enhancement in felon in possession case where defendant fired the gun); see also M.G.L. c. 265, §13A, Assault by Means of a Dangerous Weapon; M.G.L. c. 265, §29, Assault with Intent to Kill; and M.G.L. c. 265, §15, Assault with Intent to Murder, each of which are established by the trial evidence of this shooting.

### 4. The need for specific deterrence

It's hard to determine just how to effectively communicate any message to a defendant that is a 27-year old man who is already a veteran of the criminal justice system and who has demonstrated a proclivity for violence. Prosecutors have frequently relied upon as a crutch that the defendant has been "down this road before" when seeking enhanced sentences for repeat offenders. Unfortunately, Kevin Johnson has already been down this very path in this very court on this very same charge. Indeed, Johnson was the beneficiary of a low-end of the guidelines sentence of 37 months for unlawfully possessing a loaded firearm on Warren Avenue in Roxbury, MA and was in the

midst of his period of unsuccessful supervised release term at the time of this offense.[5]  Clearly, he does not get it even after serving federal prison time and being monitored by this court's probation office.  A much stiffer sentence — one that meets the maximum afforded, is now necessary to get through to Johnson that obeying criminal laws is not merely a good idea, but comes with sharp consequences for the failure to do so.

### 5. **The need for general deterrence**

The desire to slow, or for that matter to stop altogether others from following in Johnson's footsteps is a lofty goal. It's easy to recognize this and to say that residents deserve our help.  The task is made still easier by the chilling confirmation contained in the literature regarding the lethal effects that guns and gangs have. See Kennedy, "Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction (Routeledge Studies in Crime and Economics 2009), p. 78 ("There is an embarrassment of riches on the high rate of gang offending"). See also Braga, et al "New Approaches to the Strategic Prevention of Gang and Group Involved Violence" in C. Ronald Huff (ed), *Gangs*

---

[5] Johnson will undoubtedly raise his difficult upbringing and mental health concerns as basis for mitigation of his sentence.  Why not, he did it in his last federal gun case, and it worked. See criminal no. 06-10412-PBS, docket entry #s 45-46. But how many times can he keep going to that well.  These issues should carry no weight here given they were credited previously and the circumstances of Johnson's present conviction.

8

*in America,* (Sage Publications 2002)(gangs representing less than 1 percent of the population were responsible for at least 60% of homicides in Boston and at least half the homicides in Minneapolis, Baltimore, and Indianapolis). These statistics point to the obligation the criminal justice system has when faced with violent offenders who persist in carrying guns. See generally United States v. Dillard, 214 F.3d 88, 93 (2d. Cir. 2000) ("The prohibition of gun possession by previously convicted criminals seeks to protect society by reducing the risk of violence that may result from the possession of guns by persons inclined to crime. By possessing guns in violation of that law, previously convicted criminals increase the risk that they may engage in violent acts. The risk results from the nature of the offense.").

In our district, the perpetrators of gun violence fall into depressingly consistent categories.  They are usually young, black, invariably come from a concentrated area of our city, and are almost always already well known to the criminal justice system. See Braga, "Losing Faith? Police, Black Churches, and the Resurgence of Youth Violence in Boston," 6 Ohio State Journal of Criminal Law Volume 1 at 141-172 (Fall 2008) pp. 6-7 (identifying Boston homicide offenders as young men of color between the ages of 18 and 24 (with an additional 20.7% under the age of 17), who were well known to the criminal justice system and involved in

area gangs (with that number increasing to 76.9% in 2006). As Braga summarized the profile of these offenders: "Most of the violence is highly concentrated in a few places and among few youth. These youth tend to be criminally active, gang-involved offenders who were well known to the criminal justice system and caught up in ongoing cycles of retaliatory street violence."[6] Because this group (which surely includes Kevin Johnson) lies at the heart of our urban violence and its members are among the most likely to recidivate,[3] they are also individuals who must be dealt with if public safety is to be protected.

The requested sentence serves important purposes of general deterrence. The government requests that a message be sent to others similarly situated to Johnson who have been in and out again, in the criminal justice system. The message should be unmistakably clear, that firearm violence in our city will not be tolerated. See 18 U.S.C. §3553 (a)(1)(B) (sentencing goals include the need to afford adequate deterrence to criminal

---

[6] As headlines from area papers all too often show, the victims in the indiscriminate "retaliatory" violence are often innocent third parties either misidentified by their assailants or simply in the wrong place. In 2009, for example, the 227 shootings in Boston produced 54 innocent third-party victims who included girlfriends, neighbors, and complete strangers who were believed not to be the intended targets of the shooter.

[3] See "Massachusetts Recidivism Study: A Closer Look at Releases and Returns to Prison" (Urban Institute 2008) (recognizing high recidivism rates for young, single African American males in Massachusetts study of inmates released in 2002)(available at www.urban.org/publications/411657.html).

conduct). See also United States v. Cavera, 550 F.3d 180, 196 (2d. Cir. 2008) (in affirming above-guideline sentence based on local concerns about gun trafficking, Second Circuit noted that, "The environment in which a crime was perpetrated may, in principle, inform a district court's judgment as to the appropriate punishment in any number of ways"). Deterrence is important because it can work to reduce crime and the misery so often imposed on innocent victims. See, e.g., McDowell et al, "A Comparative Study of the Preventative Effects of Mandatory Sentencing Laws for Gun Crimes," 83 Journal of Criminal Law and Criminology 378-394 (1992) (mandatory sentences for gun crimes reduced violent crime in six cities).

Deterrence must be effectively communicated. At least one commentator has correctly recognized that "the deterrence threat may best be viewed as a piece of advertising." Zimring and Hawkins, *Deterrence, the Legal Threat in Crime Control,* p.142 (Univ. Of Chicago Press 1973). Through its decisions, this Court is an important messenger to the target audience perpetrating the violence. Lenient sentences risk sending a message that the conduct at issue carries little risk or that the sentences imposed are somehow unjust and therefore lack moral suasion. See "Judge Skips Guidelines, Releases Man in Crack Case" (Boston Globe November 21, 2007)(story about federal judge sentencing crack dealer at Bromley Heath to time served and stating that

11

"prison sentences for such crimes often do more harm to black communities than good"). Such messages can also undercut law enforcement efforts to make communities safer and exacerbate mistrust between the police and the people they serve. Compare Skogan et al,(eds) *Fairness and effectiveness in Policing: the Evidence (*National Academies Press 2001) at 6 ("Research has found that people obey the law not just because they are afraid of being punished or because they believe the law is morally right, but also because they believe the law and its enforcement is impartial and being fairly administered") with United States v. Bannister, 786 F.Supp.2d 617, 660 (E.D.N.Y.) ("General deterrence particularly may be impaired when the perceived injustice of punishment damages the credibility of the justice system"). On the other hand, messages that take into account the seriousness of gun violence and the need to protect public safety by imposing guideline sentences on violent offenders with guns can help make communities safer and deter others from committing the same crimes.

### 6. **The defendant's discarding of the gun**

The need for a serious sentence in this case is also demonstrated by what the defendant did with the gun after he was approached by the officers investigating him. As the Court heard during the trial, Kevin Johnson removed the gun and magazine from his waistband and tossed it against a multi-family house in a

residential neighborhood before fleeing. Probation did not impose an enhancement under U.S.S.G. §3C1.2.[4] That section requires a two-level increase whenever a defendant recklessly creates a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer. The government does not seek the departure here. Instead the government uses this to demonstrate the seriousness of the gun tossing incident to others. Johnson's reckless handling of the gun in a densely populated apartment complex while fleeing from the police endangered persons and courts have agreed that a higher sentence is proper. E.g., United States v. Lard, 327 F.3d 551, 553 (7th Cir. 2003) (affirming enhancement where defendant, while being chased by police, discarded gun that subsequently discharged).[5]

---

[4] Nor did the government request the enhancement principally because the guideline sentencing range determined by Probation already exceeded the statutory maximum sentence for the offense. In other words, the enhancement would effectively have no impact.

[5] Numerous other cases have upheld reckless endangerment enhancements against a defendant who merely discarded a gun in an area where it was likely to be recovered by a third party. E.g., United States v. May, 430 Fed.Appx. 520 (6th Cir. 2011)("it was reckless to discard a loaded firearm in a public housing complex where it would likely be found by someone because such conduct is a 'gross deviation from the standard of care that a reasonable person would exercise.' Moreover, because it was possible that someone, whether an adult or child, would recover and discharge the firearm, [the defendant] created a risk of death or serious bodily injury."); United States v. Rogers, 423 Fed.Appx. 636, 640 (7th Cir.2011)("[H]e discarded a loaded revolver in a residential neighborhood at night, creating a substantial risk that someone

Again, the government does not recount these particulars merely to show that the enhancement is warranted under U.S.S.G. §3C1.2. The real reason to focus on these events is to recognize that the defendant's reactions could have resulted in death or serious injury to him, any one of the officers, or to innocent third parties unlucky enough to have found the gun and loaded magazine.

### 7. The defendant's criminal record

Another compelling reason to impose the ten-year sentence requested in this case is the defendant's criminal record. As set forth above, the offense of conviction in this case is the defendant's *third gun-related offense*. PSR at ¶¶43-44. Prior convictions include an ammunition conviction and a prior federal gun offense,[6] along with an assault and battery on a police

---

would find it and get hurt.") United States v. Allen, 51 F.3d 273, 1995 WL 140837, at *4 (6th Cir.1995) (discarding even an unloaded gun in an area where it could easily be recovered was reckless endangerment; court also noted that "the fact that the police retrieved the gun before [anyone else recovered it] did not erase the creation of a substantial risk.").

[6]   With repetition bordering on redundancy, the government emphasizes that Johnson was on supervised release for this prior federal gun offense at the time of the commission of the offense of conviction. Johnson received a period of 14 months incarceration due to the violation of his supervised release conditions after his arrest. The government saw fit to negotiate a plea at various times during the case that credited Johnson for the supervised release violation term of incarceration on the sentence imposed in this matter. To do so now, after a jury verdict, would be simply be inappropriate. See U.S.S.G. §7B1.3(f) and application note 4. (requiring that any term of imprisonment

officer in 2002. PSR at ¶42.  The defendant's record surely supports a sentence 17 months below the high end of the applicable sentencing guidelines.  Given this, the ten-year sentence the government is seeking is both reasonable and appropriate in this case.

### 8. Supervised Release

Given the defendant's prior complete failure while on supervised release, the government recommends that the following be included:

#### A.  Curfew

The government requests that the Court impose a curfew from 7:00 p.m. to 6:00 a.m. for the first 15 months after the defendant is released from prison or any community corrections confinement (either under BOP of Court supervision.  See, e.g., "Maximum Impact: Targeting Supervision on Higher-Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009)(concluding that Probationers are "at the highest risk of re-arrest during the first few months on community supervision," that arrest rates after 15 months were substantially lower, and thus recommending that probation resources be "front-end loaded" to achieve maximum effect).  The

---

imposed upon for a criminal offense shall be served consecutively to any sentence imposed on the revocation of supervised release regardless of whether the conduct was the basis of the revocation of supervised release).

government also suggests that the defendant's probation officer should be allowed to relax the curfew for work or school and that it be enforced by electronic monitoring.

### B. Geographic Restrictions

The defendant's historic interactions with the police and the criminal justice system show that he has not concentrated his activity in any particular area. For this reason, in the prior matter in this District, the Court imposed a restriction on Johnson entering the entire city of Boston without the permission of his probation officer. This was a central component of the Court's imposition of a low-end of the sentencing range. Johnson violated this provision with his presence, and indeed firing of a gun at others, while in the city. As stated at the previous sentencing by the government, Johnson simply cannot be permitted back into the city or he will be shot, *or will shoot someone else*. Nothing has changed, this geographic restriction is still critical.

### C. Drug testing and Counseling

The defendant should be drug tested while on supervised release and should be given counseling if considered appropriate by Probation.

### D. Vocational and Educational Training

The defendant has limited vocational skills. The government believes that the Court should make a judicial recommendation

16

that the defendant be provided with any available vocational training while in prison and that he take advantage of any such classes and/or training while on Supervised Release.

### E. RESTART/OMRT recommendation

The government also believes that the defendant should be encouraged to participate in the RESTART and MRT Programs upon his release.

Based on the foregoing, the government requests that the defendant be incarcerated for 120 months and receive supervised release for three years. The government also requests the specific conditions of supervised release referenced above.

                                          Respectfully submitted,

                                          CARMEN M. ORTIZ
                                          UNITED STATES ATTORNEY

                                By:   s/ Glenn A. MacKinlay
                                     GLENN A. MACKINLAY
                                     JOHN A. WORTMANN, JR.
                                     Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I, Glenn A. MacKinlay, Assistant U.S. Attorney, certify that I caused a copy of the foregoing to be served by efiling on:

COUNSEL OF RECORD

on August 7, 2012.

> By: s/ Glenn A. MacKinlay
> GLENN A. MACKINLAY